UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

SCOTT SEDORE,

              Plaintiff,

v.

SHERRY BURT, *et al.*,

              Defendants.

_____/

Case No. 1:16-cv-903

Hon. Paul L. Maloney

**REPORT AND RECOMMENDATION**

This is a *pro se* civil rights action brought by a state prisoner at a Michigan
Department of Corrections (MDOC) facility pursuant to 42 U.S.C. § 1983.  This matter is now
before the Court on a motion for summary judgment filed by defendants Barbara Bien, P.A., Jon
Decker, M.D., Suzanne Howard, M.D., and Richard Worel, M.D. (collectively referred to as the
"Corizon defendants") (ECF No. 125), and a motion for summary judgment filed by defendants
Sherry Burt, Michael Wilkinson, and Tamerla Hamilton (collectively referred to as the "MDOC
defendants") (ECF No. 140).

    **I.**      **Background**

Plaintiff filed a 27-page complaint.  By way of background, on October 9, 2009,
while driving intoxicated, plaintiff caused a motor vehicle accident which killed one person,
injured another, and caused himself serious injuries.  Compl. (ECF No. 1, PageID.7).  Plaintiff was
convicted of crimes related to the accident.  Due to his criminal history, plaintiff was sentenced as
an habitual offender and began serving his sentence at the MDOC on May 19, 2011.  *Id.* at
PageID.11.  According to plaintiff, since his incarceration at the MODC, he has "slid dramatically

1

backwards in physical health," has "pursued and fought for adequate medical care," and has been transferred six times.  *Id*. at PageID.11-12.  Plaintiff stated that he needs medical care related to the following: cardiology exam; swollen lymph nodes in the right side of his chest; ongoing physical therapy; ongoing orthotics and treatment; respiratory/lung specialist assessment; urologist referral; orthopedic surgeon referral (related to his November 2013 hip replacement); left knee problem; right knee problem; comprehensive program for pain management; remove rod in left femur; neuro-psychology treatment; posttraumatic stress disorder; medical devices related to his disabilities (air mattress, orthopedic shoes, a walker, ice for his left foot, hot water bottle for chronic back pain, ace bandages, urinal bottle, medical detail for unlimited bathroom access due to urinary problems, padded cane handle, basin tub to soak feet, heavy duty diaper/incontinence undergarment); and, to purchase a wheelchair, shower chair, and necessary appliances and supplies at his own expense.  *Id*. at PageID.12-15.

In this case, plaintiff's complaint named the following defendants at the Muskegon Correctional Facility ("MCF"): Warden Sherry Burt; Health Unit Manager ("HUM") and RN Michael Wilkinson; RN Tamerla Hamilton;[1] PA Barbara Bien; Dr. Jon W. Decker; Dr. Richard Worel; Dr. Suzanne Howard; and Corizon, Inc ("Corizon").  *Id*. at PageID.2-3.  At the heart of plaintiff's complaint is plaintiff's claim that he received "barbaric" medical care since being transferred to MCF on June 4, 2015.[2]  *Id*. at PageID.17.

The Court adopted the undersigned's recommendation that some claims be dismissed, that defendant Corizon, Inc., be dismissed, and that the case proceed "on plaintiff's

---

[1] While plaintiff's complaint refers to RN Hamilton as "Nursing Supervisor" (ECF No. 1, PageID.1), Hamilton stated that her title was Registered Nurse Manager at MCF (ECF No. 140-3, PageID.2179).

[2] Plaintiff is a serial filer of lawsuits alleging inadequate medical treatment.  After filing this action related to his treatment at MCF, plaintiff filed similar lawsuits complaining about his medical treatment and accommodations at the Kinross Correctional Facility (*Sedore v. MacLaren*, 2:17-cv-7) (W.D. Mich.), the Lakeland Correctional Facility (*Sedore v. Nagy*, 1:19-cv-61) (W.D. Mich.), and the Gus Harrison Correctional Facility (*Sedore v. Campbell*, 2:19-cv-10311) (E.D. Mich.).

claims that the individual defendants violated his Eighth Amendment rights by being deliberately indifferent to his serious medical needs as alleged in **Counts I-X**, **XII**, **XIV**, and **XVIII-XX**, and that defendants Wilkinson and Hamilton retaliated against plaintiff in violation of the First Amendment as alleged in Counts **XIII** and **XVI**."  R&R (ECF No. 85, PageID.1549-1550) (emphasis in original); Order Adopting R&R (ECF No. 95, PageID.1585).  As discussed in the Court's Order (ECF No. 95), the following claims survived defendants' dispositive motions and form the basis of this lawsuit:

**Count I.**  Since June 4, 2015, plaintiff has written kites to MCF Warden Burt about his poor medical care at MCF, but the Warden has never spoken to him or intervened on his behalf.

**Count II**.  In June 2015, PA Bien denied plaintiff a referral to a urologist and adequate pain medication.

**Count III**.  On June 10, 2015, HUM Hamilton cancelled plaintiff's accommodation order for a padded cane handle.

**Count IV**.  On June 24, 2015, HUM Wilkinson and NS Hamilton scheduled an appointment with Dr. Howard to discuss plaintiff's details and accommodations, which resulted in Dr. Howard taking away plaintiff's basin tub and Epsom salts.

**Count V**.  On June 24, 2015, Dr. Howard ignored plaintiff's plea for adequate pain medication.

**Count VI**.  On August 7, 2015, HUM Wilkinson and NS Hamilton scheduled plaintiff to see Dr. Worel to discuss details and accommodations, which resulted in the doctor cancelling plaintiff's hot water bottle, ace wrap, and ice.

**Count VII**.  On August 7, 2015, Dr. Worel ignored plaintiff's plea for adequate pain medication.

3

**Count VIII**.  In September 2015, PA Bien ignored plaintiff's pleas to refer him to a urologist and for adequate pain medication.

**Count IX**.  On October 15, 2015, PA Bien cancelled plaintiff's pain medication, because he would not take Pamelar and Mobic.

**Count X**.  In December 2015, PA Bien ignored plaintiff's pleas to refer him to a urologist and for adequate pain medication.

**Count XII**.  On January 26, 2016, Wilkinson took away plaintiff's shower chair.

**Count XIII**.  On February 18, 2016, HUM Wilkinson and NS Hamilton retaliated and harassed plaintiff by having officers shake down his cell.

**Count XIV**.  On April 1, 2016, Dr. Decker ignored plaintiff's plea for adequate pain medication.

**Count XVI**.  On April 20, 2016, HUM Wilkinson and NS Hamilton retaliated and harassed plaintiff by having officers shake down his cell.

**Count XVIII**.  On April 21, 2016, Dr. Decker ignored plaintiff's pleas to send him to a urologist and for adequate pain medication.

**Count XIX**.  On May 12, 2016, Dr. Decker cancelled plaintiff's accommodation for a shower chair.

**Count XX**.  On May 12, 2016, Dr. Decker ignored plaintiff's pleas to send him to a urologist and for adequate pain medication.

## II.    Motions for summary judgment

## A.    Legal standard

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."

4

Fed. R. Civ. P. 56(a).  Rule 56 further provides that a party asserting that a fact cannot be or is genuinely disputed must support the assertion by:

> (A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or
>
> (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

Fed. R. Civ. P. 56(c)(1).

In *Copeland v. Machulis*, 57 F.3d 476 (6th Cir. 1995), the court set forth the parties' burden of proof in a motion for summary judgment:

> The moving party bears the initial burden of establishing an absence of evidence to support the nonmoving party's case.  Once the moving party has met its burden of production, the nonmoving party cannot rest on its pleadings, but must present significant probative evidence in support of the complaint to defeat the motion for summary judgment. The mere existence of a scintilla of evidence to support plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff.

*Copeland*, 57 F.3d at 478-79 (citations omitted).  "In deciding a motion for summary judgment, the court views the factual evidence and draws all reasonable inferences in favor of the nonmoving party." *McLean v. 988011 Ontario Ltd.*, 224 F.3d 797, 800 (6th Cir. 2000).  However, the Court is not bound to blindly adopt a non-moving party's version of the facts.  "When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Scott v. Harris*, 550 U.S. 372, 380 (2007).

### B.    Corizon defendants

### 1.    Failure to exhaust

The PLRA provides that a prisoner bringing an action with respect to prison conditions under 42 U.S.C. § 1983 must first exhaust available administrative remedies.  *See Porter v. Nussle*, 534 U.S. 516 (2002); *Booth v. Churner*, 532 U.S. 731 (2001).  A prisoner must exhaust available administrative remedies, even if the prisoner may not be able to obtain the specific type of relief he seeks in the state administrative process. *See Porter*, 534 U.S. at 520; *Booth*, 532 U.S. at 741.  One reason for creating prisoner grievance procedures under the PLRA was to create an administrative record for the court.

> Requiring exhaustion allows prison officials an opportunity to resolve disputes concerning the exercise of their responsibilities before being haled into court.  This has the potential to reduce the number of inmate suits, and also to improve the quality of suits that are filed by producing a useful administrative record.

*Jones v. Bock*, 549 U.S. 199, 204 (2007). In order to properly exhaust administrative remedies, prisoners must complete the administrative review process in accordance with the deadlines and other applicable procedural rules.  *Id.* at 218; *Woodford v. Ngo*, 548 U.S. 81, 90-91 (2006). "Compliance with prison grievance procedures, therefore, is all that is required by the PLRA to 'properly exhaust.'"  *Jones*, 549 U.S. at 218.

The MDOC requires prisoners to follow a three-step process to exhaust grievances. *See* Policy Directive 03.02.130 (effective July 9, 2007).  A prisoner must first attempt to resolve a problem with the staff member within two business days of becoming aware of the grievable issue, unless prevented by circumstances beyond his or her control.  *Id.* at ¶ P.  If the issue is not resolved, then the grievant may file a Step I grievance on the prescribed form within five business days after the grievant attempted to resolve the issue with appropriate staff.  *Id.* at ¶¶ P and R.  The Policy Directive provides the following directions for completing grievance forms:

6

> The issues should be stated briefly but concisely.  Information provided is to be limited to the <u>facts</u> involving the issue being grieved (i.e., who, what, when, where, why, how).  Dates, times, places and names of all those involved in the issue being grieved are to be included.

*Id.* at ¶ R (emphasis in original).  The prisoner must send the Step I grievance to the appropriate grievance coordinator.  *Id.* at ¶ V.  If the prisoner is dissatisfied with the Step I response, or does not receive a timely response, he must request the appropriate form and send it to the Step II Grievance Coordinator.  *Id.* at ¶ BB.  Finally, if a prisoner is dissatisfied with the Step II response, or does not receive a timely response, he must send a completed Step III grievance, using the appropriate form, to the Grievance and Appeals Section.  *Id.* at ¶ FF.

### a.    PA Bien (Counts II, VIII, IX, and X)

Plaintiff has four claims against defendant Bien: Count II (Bien failed to refer plaintiff to a urologist in June 2015); Count VIII (Bien ignored plaintiff's request for a urologist referral and pain medication in September 2015); Count IX (Bien cancelled plaintiff's pain medication on October 15, 2015); and Count X (Bien ignored plaintiff's request for a referral to a urologist and pain medication in December 2015).   Defendant Bien points out that while plaintiff filed seven grievances at MCF, none of them exhausted the claims against her: MCF-15-06-0600-28I ("600") (June 9, 2015)[3] (denial of adequate accommodations and details for wheelchair use and his disability needs) (PageID.1734);  MCF-15-08-0837-12Z ("837") (August 7, 2015) (denial of access to a pulmonary specialist) (PageID.1739); MCF-15-08-0836-12Z ("836") (August 7, 2015) (PageID.1744) denial of access to a neuro-psychologist for past trauma to the head); MCF-15-08-0856-28i ("856") (August 11, 2015) (denial of treatment for ongoing cardiac concerns) (PageID.1749); MCF-16-01-0103-12z ("103") (January 19, 2016) (Medical Provider ("MP") discontinued his accommodation for incontinence garments) (PageID.1754); MCF-16-07-0805-

---

[3] The date in parenthesis is the "date of incident" stated in the grievance.

28A ("805") (July 1, 2016) (denial of special accommodations for his urinary incontinence) (PageID.1758); and, MCF-16-07-0806-28A ("806") (July 1, 2016) (denial of adequate medical care) (PageID.1763).[4]  *See* Grievances (ECF No. 125-7, PageID.1730-1763).  Based on this record, there is no evidence that plaintiff properly exhausted any grievances with respect to the four claims alleged against defendant PA Bien.  *See Jones*, 549 U.S. at 218-19; *Woodford*, 548 U.S. at 90-93. Accordingly, PA Bien is entitled to summary judgment on the claims alleged against her.[5]

###    b.    Dr. Decker (Counts XIV, XVIII, XIX, and XX)

Plaintiff has four claims against defendant Dr. Decker: Count XIV (Decker ignored plaintiff's request for pain medication on April 1, 2016); Count XVIII (Decker ignored plaintiff's request to send him to a urologist and for adequate pain medication on April 21, 2016); Count XIX (Decker cancelled plaintiff's accommodation for a shower chair on May 12, 2016); and, Count XX (Decker ignored plaintiff's request to send him to a urologist and for adequate pain medication on May 12, 2016).[6]  Defendant Dr. Decker points out that plaintiff filed four grievances at MCF, none of which exhausted the claims against Decker in the present action: MCF-16-05-0535-12I ("535") (April 21, 2016) (MP denied or discontinued his special accommodation for an extra blanket) (PageID.1767); MCF-16-06-0732-12E2 ("732") (June 21, 2016) (denied an evaluation and forced to sit in pain on June 21, 2016) (PageID.1772); Grievance 805 (July 11, 2016) (denial of special accommodations for urinary incontinence); and, Grievance 806 (July 11, 2016) (denial of adequate medical care).  Based on this record, there is no evidence that plaintiff properly

---

[4] The Court notes that defendants sometimes refer to grievance 806 as "086".  *See* Defendants' Brief (ECF No. 125, PageID.1697-1699).

[5] In his response, plaintiff points out that the Corizon defendants did not show exhaustion, in part, because they "did not even provide/supply a M.D.O.C. "grievance report."  Plaintiff's Response (ECF No. 133, PageID.2127).  The Court notes that the MDOC Prisoner Step III Grievance Report is part of the record, having been filed by the MDOC defendants in a previous motion for summary judgment (*see* ECF No. 47-1, PageID.1196-1200).

[6] In his brief, Dr. Decker construed the complaint as involving only two claims against him, *i.e.*, Counts XIV and XVIII.  *See* Defendants' Brief (ECF No. 125, PageID.1696).

exhausted any grievances with respect to the four claims alleged against defendant Dr. Decker. *See Jones*, 549 U.S. at 218-19; *Woodford*, 548 U.S. at 90-93. Accordingly, Dr. Decker is entitled to summary judgment on the claims alleged against him in this action.

### c.    Dr. Howard (Count V)

Plaintiff has one claim against Dr. Howard. In Count V, plaintiff alleged that on June 24, 2015, the doctor ignored his request for adequate pain medication. Dr. Howard contends that plaintiff did not exhaust this claim. The Court agrees. While Grievance MCF-15-06-646-28B ("646") involved plaintiff's June 24th visit with the doctor, it did not grieve the doctor's failure to provide pain medication.[7] Rather, the grievance consisted of a six-page collection of complaints, diatribes, and a threat to sue. Grievance 646 (ECF No. 125-7, PageID.1777-1782). This grievance was rejected pursuant to Policy Directive 03.02.130 because it contained "extraneous information, which makes it impossible to accurately respond to." *Id*. at PageID.1776. The rejection was upheld at a Steps II and III. *Id*. at PageID.1774, 1776. Plaintiff did not properly exhaust any grievance against Dr. Howard with respect to his claim. *See Jones*, 549 U.S. at 218-19; *Woodford*, 548 U.S. at 90-93. Accordingly, Dr. Howard's motion for summary judgment should be granted.

### d.    Dr. Worel (Count VII)

Plaintiff has one claim against Dr. Worel. In Count VII, plaintiff alleged that on August 7, 2015, the doctor ignored his request for adequate pain medication. Dr. Howard contends that plaintiff did not exhaust this claim. The Court agrees. Dr. Worel identified 13 grievances which plaintiff filed against him. *See* Corizon Defendants' Brief (ECF No. 125, PageID.1698-1699). Plaintiff saw Dr. Worel once on August 7, 2015. *See* Worel Aff. (ECF No. 125-5, PageID.1721). While some of the grievances filed against the doctor involved this single

---

[7] The Court notes that none of plaintiff's other grievances address his encounter with the doctor on that date.

encounter, other grievances were unrelated: MCF-15-08-0835-28A ("835") (August 7, 2015) (MP

denied his special accommodations) (PageID.1792); MCF-15-08-0833-12Z ("833") (August 7,

2015) (MP denied a referral for physical therapy) (PageID.1795); MCF-15-08-0838-12Z ("838")

(August 7, 2015) (MPs denied surgery to remove hardware in his left leg) (PageID.1802);

Grievance 837 (August 7, 2015) (denied access to a pulmonary specialist); MCF-15-08-0834-12Z

("834") (August 7, 2015) (MP denied plaintiff access to the pain management committee)

(PageID.1808); Grievance 836 (August 7, 2015) (denied access to a neuro-psychologist for past

trauma to the head); MCF-15-08-0832-12Z ("832") (August 7, 2015) (MP denied plaintiff an MRI

of his knees) (PageID.1813); MCF-15-08-0829-12z ("829") (August 7, 2015) (MP denied him

access to an offsite specialist for hip replacement) (PageID.1817); MCF-15-08-0830-12z ("830")

(August 7, 2015) (MP denied him access to a urologist) (PageID.1822); MCF-15-08-0831-12z

("831") (August 7, 2015) (MP denied plaintiff access to an orthotics specialist) (PageID.1827);

MCF-15-08-0844-28A ("844") (August 11, 2015) (MPs refused to refer plaintiff to outside

specialists and bill his no fault insurance) (PageID.1787); and, Grievance 856 (August 11, 2015)

(denial of treatment for ongoing cardiac concerns). *See* Corizon Defendants' Brief (ECF No. 125,

PageID.1698-1699).

        None of these grievances address plaintiff's claim in Count VII that Dr. Worel

ignored plaintiff's request for adequate pain medication during the August 7, 2015 encounter.

Plaintiff did not properly exhaust his claim against Dr. Worel.  *See Jones*, 549 U.S. at 218-19;

*Woodford*, 548 U.S. at 90-93.  Accordingly, Dr. Worel's motion for summary judgment should be

granted for lack of proper exhaustion.

        **e.**     **Summary**

For these reasons, the Corizon defendants, PA Bien, Dr. Decker, Dr. Howard and Dr. Worel, should be granted summary judgment because plaintiff failed to properly exhaust any grievance which addressed the remaining claims alleged against these defendants.

### 2.    Eighth Amendment claims

Furthermore, even if plaintiff had properly exhausted any of these claims, the Corizon defendants should be granted summary judgment on the merits of plaintiff's Eighth Amendment claims.  Plaintiff seeks relief pursuant to 42 U.S.C. § 1983, which "provides a civil cause of action for individuals who are deprived of any rights, privileges, or immunities secured by the Constitution or federal laws by those acting under color of state law."  *Smith v. City of Salem*, Ohio, 378 F.3d 566, 576 (6th Cir. 2004).  To state a § 1983 claim, a plaintiff must allege two elements: (1) a deprivation of rights secured by the Constitution and laws of the United States, and (2) that the defendant deprived him of this federal right under color of law.  *Jones v. Duncan*, 840 F.2d 359, 360-61 (6th Cir. 1988); 42 U.S.C. § 1983.

It is well established that an inmate has a cause of action under § l983 against prison officials for "deliberate indifference" to his serious medical needs, since the same constitutes cruel and unusual punishment proscribed by the Eighth Amendment.  *Estelle v. Gamble*, 429 U.S. 97 (l976).  Mere negligence in diagnosing or treating a medical condition does not constitute an Eighth Amendment violation.  *Farmer v. Brennan*, 511 U.S. 825, 835 (1994).  In other words, "[m]edical malpractice does not become a constitutional violation merely because the victim is a prisoner."  *Estelle*, 429 U.S. at 106.  When a prisoner received treatment for his condition, the prisoner must show that his treatment was "so woefully inadequate as to amount to no treatment at all."  *See Mitchell v. Hininger*, 553 Fed. Appx. 602, 604-05 (6th Cir. 2014), quoting *Alspaugh v. McConnell*, 643 F.3d 162, 169 (6th Cir. 2011) (internal quotation marks omitted).

11

A viable Eighth Amendment claim consists of an objective and a subjective component. *Farmer*, 511 U.S. at 834. A court considering a prisoner's Eighth Amendment claim must ask both if the alleged wrongdoing was objectively harmful enough to establish a constitutional violation and if the officials acted with a sufficiently culpable state of mind. *Hudson v. McMillian*, 503 U.S. 1, 8 (1992). The objective component requires the infliction of serious pain or failure to treat a serious medical condition. *Id.* at 8-9. "Because society does not expect that prisoners will have unqualified access to health care, deliberate indifference to medical needs amounts to an Eighth Amendment violation only if those needs are 'serious.'" *Id.* at 9.

The subjective component requires that the defendant act with deliberate indifference to an inmate's health or safety. *See Wilson v. Seiter*, 501 U.S. 294, 302-03 (1991). To establish the subjective component, the plaintiff must show that "the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." "It is obduracy and wantonness, not inadvertence or error in good faith, that characterize the conduct prohibited by the Cruel and Unusual Punishments Clause." *Whitley v. Albers*, 475 U.S. 312, 319 (1986).

### a.    Plaintiff's medical history

In his lawsuit, plaintiff contends that all defendants were deliberately indifferent to his serious medical needs at various times from throughout his period of incarceration at MCF from June 2015 through May 2016. The Corizon defendants have constructed a chronology of plaintiff's treatment at MCF which summarizes the extensive medical records in this case.[8] This

---

[8] The Court notes that plaintiff's medical care at MCF is well documented. The Corizon defendants have submitted 272 pages of medical records (ECF No. 126), while the MDOC defendants have submitted an additional 31 pages of medical records (ECF No. 141).

chronology is supported by the medical records and affidavits of treaters[9] and is set forth below:

On June 9, 2015, Barbara Bien, P.A. ("PA Bien") evaluated Mr. Sedore during a scheduled provider visit for ongoing musculoskeletal-knee, hip, and foot pain, and respiratory dyspnea. Mr. Sedore informed PA Bien of the motor vehicle accident he was involved in 2009, and complained of pain in his knees, hips, and left foot. PA Bien noted his hips to have decreased range of motion due to pain, but no crepitus, tenderness, or edema. PA Bien also noted during various knee strength tests that he was in pain with full extension of the right and left knee, but overall the pain seemed out of proportion to the exam performed. PA Bien also evaluated his respiratory function and noted clear lungs, no chest wall tenderness, no cough, and a normal respiratory effort. PA Bien's plan following this appointment was to start him on Qvar for breathing, increase his medication Elavil to aid in joint pains, and would continue to monitor and determine continued need for special accommodations. PA Bien discussed the importance of stretching and strengthening exercises in order to build bone and muscle since he appeared deconditioned. (Exhibit A, pp.6-9, Exhibit B, ¶ 3).

On June 19, 2015, Timothy Versalle, R.N. examined Mr. Sedore during a nursing visit. He complained that he was not able to stand in the chow hall line for any period of time and stated he had not eaten since June 16, 2015. RN Versalle documented that he stood from his wheelchair without difficulty and ambulated into health care using a cane. He referred Mr. Sedore to PA Bien for evaluation. (Exhibit A, pp. 11-12, Exhibit B, ¶ 4)[.]

On June 22, 2015, Mr. Sedore met with PA Bien to discuss his request for a no standing in chow line detail. PA Bien noted that based on his June 9, 2015 exam, she would order the requested detail for a short time and have the physician re-evaluate. (Exhibit A, pp 15-18, Exhibit B, ¶ 5).

On June 24, 2015, Mr. Sedore met with Suzanne Howard, M.D. ("Dr. Howard") for a provider visit to evaluate present special accommodations. Dr. Howard reviewed his chart and spoke with his providers at the Kinross Correctional Facility. Dr. Howard noted he did not have abnormal breathing yet was breathing with facial grimacing. She also made note that while in the waiting room, he was not breathing heavily or with any facial grimace, he was actually conversing with others in the waiting room. Dr. Howard noted that he refused to stand while holding on to his cane in his right hand and holding on to a chair with his left hand. Further, he refused to lift one foot and bend his knee at the same time while holding on to a sturdy chair and cane. Dr. Howard attempted to assess his knees, but he refused and would not lift his foot up or attempt to touch his toes. Dr. Howard instructed him to increase his activity level, and he voiced understanding. Dr. Howard did not change any special accommodations or discontinue his blood pressure medication

---

[9] The Exhibits are identified as follows: Exhibit A (MDOC Medical records, filed separately as ECF No. 126); Exhibit B (Affidavit of Barbara Bien, P.A. (ECF No. 125-2)); Exhibit D (Affidavit of Suzanne Howard, M.D. (ECF No. 125-4)); Exhibit E (Affidavit of Richard Worel, D.O, (ECF No. 125-5));

on this visit.  Dr. Howard referred him to mental health for an assessment. (Exhibit A, pp. 19-24, Exhibit D, ¶ 3-4)[.]

On July 2, 2015, PA Bien evaluated Mr. Sedore during a Chronic Care visit. She noted his chest was symmetric, his were lungs clear, and he did not have chest wall tenderness or a cough. PA Bien reviewed his medications and recommended increased activity and to follow his exercise program. He voiced understanding. (Exhibit A, pp. 27-30, Exhibit B, ¶ 6).

On July 27, 2015, PA Bien reviewed Mr. Sedore's chart, as he requested a renewal of his hot water bottle and ace wrap detail.  PA Bien documented there was no indication for renewal at that time. PA Bien noted ace wraps were for acute injuries and that he could heat up a wet washcloth for heat. (Exhibit A, pp. 32-33, Exhibit B, ¶ 7).

On August 7, 2015, Mr. Sedore met with Richard Worel, D.O. ("Dr. Worel") for a scheduled provider visit. He complained of pain "in every bone of his body" and requested a hot water bottle, ice detail, and ace detail. Dr. Worel advised that those remedies were for acute problems only. Dr. Worel also changed his Tylenol and ibuprofen dosages to the accepted maximum dosage and placed the medications on the Restricted Medication Line ("RML") to document compliance for the Pain Management Committee ("PMC").  Dr. Worel advised him he would need to put in effort regarding exercise and stretching as it was evident that he was not complying.  He voiced understanding.  This visit was the only involvement Dr. Worel had with Mr. Sedore's medical care. (Exhibit A, pp. 34-39, Exhibit E, ¶ 3-4).

On August 11, 2015, PA Bien met with Mr. Sedore regarding his refusal to take his Flomax.  He stated the medication did not work, and that he had also tried Hytin and Cardura, which also did not help.  PA Bien discussed requesting Proscar to assist with his urination, and he stated he was willing to try this medication.  He also requested a renewal of his ace bandage, hot water bottle, and ice detail.  Based on his August 7, 2015 visit with Dr. Worel, PA Bien noted he did not meet the criteria for the accommodations.  PA Bien reviewed his medications with him and provided patient education to which he voiced understanding.  PA Bien submitted an Acting Chief Medical Officer ("ACMO") request for Proscar. Dr. Borgerding approved this request on August 13, 2015.  (Exhibit A, pp. 47-50, Exhibit B, ¶ 8).

On August 26, 2015, PA Bien reviewed Mr. Sedore's chart regarding a written health care request ("Kite") for a refill of his inhaler.  PA Bien noted he wanted an inhaler once every two months. PA Bien would request a spirometry to determine the need.  On August 27, 2015, PA Bien submitted a consultation request ("407") for Mr. Sedore to have a spirometry test. Dr. Papendick approved this request the following day. (Exhibit A, pp. 55-60, Exhibit B, ¶ 10).

On August 27, 2015, Laura Mitteer, R.N. noted Mr. Sedore had submitted another kite requesting an albuterol inhaler.  PA Bien was contacted by RN Mitteer, and she gave a verbal order authorizing an order for an inhaler refill. (Exhibit A, p. 62, Exhibit B, ¶ 11).

On September 2, 2015, RN Mitteer saw Mr. Sedore regarding complaints of constipation.  RN Mitteer consulted with PA Bien, and she gave a verbal order for one bottle of Magnesium Citrate. (Exhibit A, pp. 63-65, Exhibit B, ¶ 12).  On September 9, 2015, PA Bien noted the spirometry tested showed possible severe restriction. (Exhibit A, p. 68, Exhibit B, ¶ 13).  On September 10, 2015, PA Bien reviewed Mr. Sedore's chart after he submitted a kite for his inhaler, as he complained it was not lasting for more than two months.  PA Bien submitted an ACMO request for an inhaler every two months, to which Dr. Borgerding responded the next day noting he could not approve the request without more information. (Exhibit A, pp. 69-72, Exhibit B, ¶ 14).

On September 14, 2015, PA Bien discussed with Dr. Borgerding Mr. Sedore's need for an albuterol inhaler every two months due to severe restriction results presented following the spirometry. Dr. Borgerding indicated that he would continue with an inhaler twice every six months, and to go to health services if he needed additional attention or breathing treatments. (Exhibit A, pp. 73-75, Exhibit B, ¶ 15).

On September 17, 2015, Mr. Sedore met with PA Bien for his Chronic Care visit. PA Bien noted that Mr. Sedore stated he walks to the bathroom and does stretches, but complained of trouble breathing, although utilizing his inhaler daily. PA Bien evaluated him and noted his respiratory effort was normal, but she was unable to do a complete hip assessment due to his resistance as the exam was too painful. PA Bien noted they would continue his medication, and order Dulcolax for his constipation since Senna was deemed ineffective.  PA Bien provided patient education regarding diet and would schedule a PMC reevaluation due to continued pain complaints.  A hip x-ray examination was scheduled, and PA Bien submitted an ACMO request for Advair and a 407 for physical therapy and scheduled a chronic care visit for December 2015.  Dr. Borgerding deferred the request for Advair stating there was no clinical indication. (Exhibit A, pp. 76-88, Exhibit B, ¶ 16-17).

On September 18, 2015, Dr. Papendick approved the request for physical therapy for evaluation, development, and training for home exercise program directed towards patient symptoms. (Exhibit A, pp. 84-84, Exhibit B, ¶ 17)[.]

On September 23, 2015, Dr. Howard provided Mr. Sedore with 60 pull up undergarments for his incontinence. (Exhibit A, p. 91, Exhibit D, ¶ 5).

On September 24, 2015, PA Bien met with Mr. Sedore for a scheduled provider visit.  The plan was for the PMC to make recommendations following his

continued complaints of pain. PA Bien described his diagnosis and treatment history to the PMC, answered his questions, and would await the recommendations from the PMC. He voiced understanding. (Exhibit A, pp. 92-95, Exhibit B, ¶ 18). On September 29, 2015, PA Bien reviewed Mr. Sedore's chart and renewed his nasal spray and Betamethasone. (Exhibit A, pp. 97-99, Exhibit B, ¶ 19).

On September 30, 2015, the PMC ordered a formulary medication or Mobic up to the maximum dose, Pamelor, and to discontinue use of the Elavil. (Exhibit A, p. 100, Exhibit B, ¶ 20).

On October 14, 2015, PA Bien gave Tamerla Hamilton, R.N. a verbal order to schedule a peak flow check by nursing staff twice a week for one month. (Exhibit A, p. 103, Exhibit B, ¶ 21).

On October 15, 2015, PA Bien evaluated Mr. Sedore during a scheduled provider visit.  He complained of the PMC medication recommendations, stating that he had already been prescribed Pamelor and Mobic both of which were ineffective, and that he did not want to take anymore Tylenol or Motrin if on the RML.  PA Bien noted that he was "aggravated by everything."  He refused to take Pamelor and Elavil and indicated he would not go to health services for breathing treatments. PA Bien ordered Tylenol and Motrin be kept on person, for him to continue his stretch exercises, and Theophylline for breathing treatment. (Exhibit A, pp. 104-107, Exhibit B, ¶ 22).

On October 29, 2015, PA Bien met with Mr. Sedore regarding refusal of his Lisinopril, Qvar, Proscar, and Theophylline.  He stated that these medications never helped him.  He complained of hip pain, difficulty urinating, and his inability to breathe.  PA Bien evaluated and determined that previous examinations showed no abdominal enlargement due to retained urine.  He requested an air mattress, extra blanket/pillows, a new wheelchair, and meals in through the winter.  PA Bien presented him with the right of refusal in regard to the medication refusals after discussing the risks with him.  He refused to sign the document and indicated he was aware of the risks.  PA Bien also informed him he was not eligible for the special accommodations he requested.  (Exhibit A, pp. 108-112, Exhibit B, ¶ 23).

On November 10, 2015, Timothy Versalle, R.N. examined Mr. Sedore for complaints of a boil and cyst on his right buttock cheek.  RN Versalle contacted Dr. Howard and she gave a verbal order for Bactrim twice a day for ten days and instructed him to drink plenty of fluids. (Exhibit A, pp. 113-115, Exhibit D, ¶ 6). This encounter was the last Dr. Howard was involved with Mr. Sedore's medical care. (Exhibit D, ¶ 7).

On December 1, 2015, PA Bien gave RN Hamilton a verbal order to complete a Post Void Residual ("PVR") on December 2, 2015. (Exhibit A, pp. 116-117, Exhibit B, ¶ 24).  On December 3, 2015, PA Bien reviewed Mr. Sedore's chart and noted a review of the PVR results of 2.5cc. (Exhibit A, pp. 119-120, Exhibit B,

¶ 25).  On December 7, 2015, PA Bien reviewed Mr. Sedore's chart and noted his abnormal low-density lipoproteins ("LDL") levels which would be discussed at his next chronic care visit. (Exhibit A, pp. 121-122, Exhibit B, ¶ 26).  On December 16, 2015, PA Bien provided Mr. Sedore with 60 Prevail undergarments and replaced the tip on his cane. (Exhibit A, p. 123, Exhibit B, ¶ 27).

On December 29, 2015, Mr. Sedore met with PA Bien for his Chronic Care visit.  He indicated he was not taking his blood pressure medication, Tylenol, or Motrin, as they do not help his condition.  He indicated he was using his inhaler, but that was also not working.  PA Bien discontinued his blood pressure medication as his blood pressure was normal, however his lipids were elevated so she ordered Zocor.  PA Bien noted he should continue with his hip exercises and did not approve a requested bathroom detail, as there was no indication shown. (Exhibit A, pp. 124-129, Exhibit B, ¶ 28)[.]

On January 19, 2016, PA Bien met with Mr. Sedore for an unscheduled visit to discuss special accommodation of incontinence garments.  He was found to have 152 garments in his housing unit.  PA Bien discontinued the special accommodation as it was clearly not necessary.  (Exhibit A, pp. 130-132, Exhibit B, ¶ 29)[.]

On April 1, 2016, Jonathan Decker, D.O. ("Dr. Decker") evaluated Mr. Sedore during a Chronic Care visit for ongoing respiratory and cardiovascular issues.  Dr. Decker noted he had refused Qvar and was to return the medication. Dr. Decker noted his hypertension was not exacerbated, that his cholesterol was well controlled, and ordered labs to be drawn before his next chronic care visit in July. Dr. Decker continued his other medication and provided patient education to which he voiced understanding. (Exhibit A, pp. 133-137, Exhibit C, ¶ 3).

On April 20, 2016, PA Bien reviewed Mr. Sedore's chart and documented he was found to have a cotton blanket spread under his wool blanket.  PA Bien noted he was using the cotton blanket inappropriately, as he was provided the blanket to be used as a hip cushion, which he was not doing. Custody staff also advised PA Bien he never used the toilet seat rise.  PA Bien documented both accommodation issues, which were to be discontinued at his next appointment. (Exhibit A, pp. 138-139, Exhibit B, ¶ 30).

On April 21, 2016, Dr. Decker evaluated Mr. Sedore during a scheduled provider visit.  He complained that his Qvar was not effective. Dr. Decker noted that it was questionable as to whether Mr. Sedore was utilizing his Qvar appropriately.  He noted Mr. Sedore had unrealistic expectations and utilization of his medications.  Dr. Decker noted his right knee was flexing and extending appropriately. Dr. Decker ordered a chest x-ray. Dr. Decker noted he was utilizing his special accommodation blanket inappropriately. (Exhibit A, pp. 140-145, Exhibit C, ¶ 4).

On April 26, 2016, Dr. Decker reviewed Mr. Sedore's chart and noted he was to return to healthcare to be reassessed, and at that time his wheelchair detail would be reassessed. (Exhibit A, pp. 146-148, Exhibit C, ¶ 5). Dr. Decker reviewed Mr. Sedore's x-ray results from his May 4, 2016 chest x-ray. He noted there was borderline to mild cardiac enlargement, an old granuloma of the right upper lobe, and mild chronic changes seen in the lungs. There were no active infiltrates seen. (Exhibit A, p. 151, Exhibit C, ¶ 6).

On May 12, 2016, Mr. Sedore presented for a scheduled provider visit. Dr. Decker noted his right hip pain was ongoing and denied any relieving factors. Dr. Decker noted he had a clinically short leg, and anatomically it was not a significant difference. When Mr. Sedore stood, there was a three-inch difference noted between his ilia. Dr. Decker noted it may have been a problem with his prior surgeries. Dr. Decker submitted a 407 for a Duane Waters Hospital ("DWH") orthopedic assessment for a possible shoe lift. He ordered an x-ray of his thigh and lower leg to compare lengths of his femurs and tibias. He also ordered a shower chair for Mr. Sedore. He did not cancel any of his other accommodations. (Exhibit A, pp. 152-157, Exhibit C, ¶ 7). Dr. Papendick approved the request for the orthotics consultation and state oxford lift on May 17, 2016. (Exhibit A, pp. 158-159, Exhibit C, ¶ 8).

Dr. Decker reviewed the result of Mr. Sedore's May 18, 2016 x-ray. He noted there were no osseous changes identified in the left tibia and fibula and there were no acute findings identified in the right tibia and fibula. Dr. Decker noted there was an old healed trauma identified in the distal shaft of the left femur and that an intra-medullar rod was secure within the left femur. The right hip protheses appeared to be anatomically aligned and opposed and there were no acute changes identified in the right femur. (Exhibit A, pp. 162-163, Exhibit C, ¶ 9).

Corizon Defendants' Brief (ECF No. 125, PageID.1676-1685).

As discussed, plaintiff's claims in this lawsuit end as of May 2016. However, to place plaintiff's treatment in context, the Court has included a summary of his treatment through December 13, 2016, when he was transferred to the Alger Correctional Facility:

On June 13, 2016, Dr. Decker submitted an ACMO request for an orthopedic shoe noting Mr. Sedore was unable to add the lift in his state issued shoe. Dr. Borgerding approved this request the same day. (Exhibit A, pp. 164-166, Exhibit C, ¶ 10). On July 20, 2016, Dr. Decker submitted a 407 for orthotics and custom shoes. Dr. Papendick approved this request the following day. (Exhibit A, pp. 167-171, Exhibit C, ¶ 11).

On July 25, 2016, Dr. Decker evaluated Mr. Sedore during a Chronic Care Visit and noted his ongoing cardiovascular problem was controlled with medication

and his respiratory issue was difficult with use of Theophylline.  Dr. Decker discussed the ordered medical shoe with lift and the possibility of this leg issue generating pain.  Dr. Decker restarted his medications, decreased his Theophylline to once a day, and scheduled a chronic care visit in October with no labs.  Dr. Decker documented they were currently waiting for his shoes from DWH. (Exhibit A, pp. 172-176, Exhibit C, ¶ 12).

During the month of August 2016, Dr. Decker performed a series of reviews and updates to Mr. Sedore's chart. (Exhibit A, pp. 177-186, Exhibit C, ¶ 13-15). On August 24, 2016, Dr. Decker submitted a 407 for a physical therapy evaluation and treatment. Dr. Papendick approved the request for one visit for evaluation, development, and training for a home exercise program the same day. (Exhibit A, pp. 189-193, Exhibit C, ¶ 16)[.]

On October 3, 2016, Dr. Decker evaluated Mr. Sedore during a Chronic Care Visit for the same complaints as the prior visit.  Dr. Decker noted his compliance with his diet, medication, and follow up was good, however, he was noncompliant with exercise.  Dr. Decker noted Mr. Sedore was still waiting for his shoes to be repaired and there were no changes to his cardiovascular and respiratory issues.  Dr. Decker started Alvesco and submitted a 407 for a sleep study to assess his chronic breathing problems and a 407 for a physical therapy reevaluation.  Dr. Papendick approved both requests the same day. (Exhibit A, pp. 196-211, Exhibit C, ¶ 17).

On October 17, 2016, during a visit with Mr. Sedore and Luke Rexford, R.N., Dr. Decker observed Mr. Sedore walking and asked if he had received his new shoes.  He informed Dr. Decker he had not received his shoes.  Dr. Decker gave RN Rexford a verbal order that his evaluation needed to be postponed until his new shoes were in. (Exhibit A, p. 213, Exhibit C, ¶ 18).

On October 28, 2016, PA Bien ordered an x-ray of Mr. Sedore's right hip. This was her last involvement in Mr. Sedore's medical care. (Exhibit A, p. 220, Exhibit B, ¶ 31).

Between October 28, 2016 and November 2, 2016 Dr. Decker evaluated Mr. Sedore's recurring complaints.  Dr. Decker reviewed a recent x-ray examination and noted a bone chip and ordered an x-ray exam of his right hip. Dr. Decker also reviewed results of a recent pulmonary function test and noted some restrictive patterns and requested a repeat examination. Dr. Decker also noted his pain relief options were limited to NSAIDs and that the likelihood of PMC approving otherwise was not likely due to his unidentified pain. (Exhibit A, pp. 216-222, 227-231, Exhibit C, ¶ 19-20).

On November 4, 2016, Dr. Papendick approved a pulmonary function test with and without albuterol with diffusing capacity for carbon monoxide. (Exhibit A, pp. 223-224, Exhibit C, ¶ 21).  Dr. Decker reviewed Mr. Sedore's results from

his November 9, 2016, pelvis and right hip x-ray exam.  He compared this x-ray exam to a previous x-ray study that was done on September 23, 2015. He noted there was little to any changes identified in the pelvis with attention to his right hip, the right hip and proximal left femur were unchanged, and his sacroiliac and pubic symphysis joint spaces were unchanged in appearance. (Exhibit A, pp. 230-231, Exhibit C, ¶ 22).

On November 11, 2016, Dr. Decker reviewed Mr. Sedore's chart and noted he could participate in health care services at his discretion. Dr. Decker requested an orthopedic consultation to assess the bone fragment revealed in the x-ray. On November 14, 2016, Dr. Papendick found no medical necessity and suggested an Electromyography ("EMG") scan of the lower extremities.  (Exhibit A, pp. 232-238, Exhibit C, ¶ 23).

On November 18, 2016, Dr. Decker examined Mr. Sedore during a provider visit to discuss the alternative treatment plan for the orthopedic consultation. Dr. Decker submitted a 407 for a CT scan of his pelvis and hips.  Dr. Papendick approved this request the same day. (Exhibit A, pp. 239-244, Exhibit C, ¶ 24). On November 22, 2016, Dr. Decker submitted a 407 for a CPAP machine fitting. (Exhibit A, pp. 248-249, Exhibit C, ¶ 25).

On November 23, 2016, Dr. Decker reviewed the sleep study results and noted he requested a consult for a CPAP machine fitting.  This request was denied by Dr. Papendick citing no medical necessity was demonstrated at the time, and further, that this service did not require a consultation. It was recommended that Dr. Decker contact respiratory therapy at DWH for service. (Exhibit A, pp. 252-253, 250, 251, Exhibit C, ¶ 27).

On November 30, 2016, Dr. Decker submitted an ACMO request for a CPAP machine and a 407 request for a neurosurgery consultation. (Exhibit A, pp. 257-261, Exhibit C, ¶ 28).  On December 1, 2016, Dr. Papendick denied the request for a neurosurgery consultation.  He recommended an MRI and EMG, as both would be necessary for the consultation. (Exhibit A, pp. 262-263, Exhibit C, ¶ 29). Dr. Borgerding approved the CPAP machine and supplies on this day. (Exhibit A, p. 264, Exhibit C, ¶ 29).

On December 5, 2016, Mr. Sedore presented for a provider visit to discuss his sleep study tests. Dr. Decker discussed the approval of his CPAP machine with him.  They also discussed with images what had been occurring in terms of anatomical disruption and other ways which these problems would interfere with function. (Exhibit A, pp. 265-266, Exhibit C, ¶ 30).

Mr. Sedore was transferred to Alger Correctional Facility on December 13, 2016, and Dr. Decker had no further involvement in his medical care. (Exhibit A, pp. 269-272, Exhibit C, ¶ 31).

Corizon Defendants' Brief (ECF No. 125, PageID.1685-1688) (emphasis omitted).

      **b.**    **Discussion**

      It is undisputed that plaintiff had a myriad of medical problems prior to his incarceration.  In his present lawsuit, plaintiff claims that the Corizon defendants violated his Eighth Amendment rights by being deliberately indifferent to his serious medical needs.  Contrary to plaintiff's claims, defendants PA Bien, Dr. Decker, Dr. Howard, and Dr. Worel did not violate his federal constitutional rights.  The summary of the medical record reflects that plaintiff had continuous medical treatment while at MCF.  "[W]here a prisoner has received some medical attention and the dispute is over the adequacy of the treatment, federal courts are generally reluctant to second guess medical judgments and to constitutionalize claims which sound in state tort law." *Graham ex rel. Estate of Graham v. County of Washtenaw*, 358 F.3d 377, 385 (6th Cir. 2004) (internal quotation marks omitted).  Plaintiff disagrees with defendants' medical judgment, considers his medical treatment to be akin to "torture" (Plaintiff's Response (ECF No. 144, PageID.2268),  and wants to have additional treatment, such as referrals for physical therapy, referrals for surgery, referrals for MRIs, and referrals to specialists.  As discussed, plaintiff received substantial medical treatment at MCF.  Plaintiff's disagreement with the medical treatment provided by the medical staff at MCF does not form the basis for a federal constitutional claim.  "[A] difference of opinion between a prisoner and the prison medical staff about medical treatment does not constitute deliberate indifference." *Woodberry v. Simmons*, 146 Fed. Appx. 976, 977 (10th Cir. 2005). *See Owens v. Hutchinson*, 79 Fed. Appx. 159, 161 (6th Cir. 2003) ("[a] patient's disagreement with his physicians over the proper medical treatment alleges no more than a medical malpractice claim, which is a tort actionable in state court, but is not cognizable as a federal constitutional claim"). As one court stated, "[t]he Constitution decidedly does not require

21

states to make prisons comfortable, and a prison sentence is not a voucher for free health care on demand." *Lee v. Beard*, No. 4:CV-03-1026, 2008 WL 744736 at *8 (M.D. Pa. March 18, 2008).

Furthermore, the record does not establish that defendants met the subjective prong of a deliberate indifference claim by disregarding an excessive risk to plaintiff's health or safety. The meet the subjective prong, a plaintiff must establish that a defendant acted with "obduracy and wantonness, not inadvertence or error in good faith, that characterize the conduct prohibited by the Cruel and Unusual Punishments Clause." *Whitley*, 475 U.S. at 319.

The Supreme Court has described "wanton" conduct as follows:

> "Wanton means reckless—without regard to the rights of others. . . . Wantonly means causelessly, without restraint, and in reckless disregard of the rights of others. Wantonness is defined as a licentious act of one man towards the person of another, without regard to his rights; it has also been defined as the conscious failure by one charged with a duty to exercise due care and diligence to prevent an injury after the discovery of the peril, or under circumstances where he is charged with a knowledge of such peril, and being conscious of the inevitable or probable results of such failure."
>
> *Smith v. Wade*, 461 U.S. 30, 39 n. 8, 103 S.Ct. 1625, 1631 n. 8, 75 L.Ed.2d 632 (1983) (quoting 30 American and English Encyclopedia of Law 2–4 (2d ed.1905) (footnotes omitted)).

*Hurley v. Deutsche Bank Trust Company Americas*, No. 1:08-cv-361, 2010 WL 5293592 at *5 (Dec. 17, 2010), *on reconsideration in part,* 2011 WL 13196175 (W.D. Mich. Feb. 4, 2011).  The record in this case does not reflect that any of the individual Corizon defendants engaged in "wanton" conduct.  Plaintiff has not shown that the medical treatment provided at MCF was "so woefully inadequate as to amount to no treatment at all."  *See Mitchell*, 553 Fed. Appx. at 604-05. For all of these reasons, defendants PA Bien, Dr. Decker, Dr. Howard and Dr. Worel should be granted summary judgment on plaintiff's Eighth Amendment claims.

## C.    MDOC Defendants

### 1.    Qualified Immunity

The MDOC defendants' brief includes a claim for qualified immunity which consists of a recitation of the legal standard for qualified immunity followed by a conclusory statement (apparently taken from a brief in a different case), "For the reasons stated in the arguments set forth above, Defendants Beechler and Tribble [sic] are entitled to qualified immunity because Plaintiff has not demonstrated that they violated any clearly established constitutional or statutory right."  Defendants' Brief (ECF No. 140, PageID.2160).   Even if defendants' brief had referenced the defendants in this case, this cursory and conclusory argument is inadequately briefed and will not be considered by the Court.   "[I]ssues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived.  It is not sufficient for a party to mention a possible argument in a most skeletal way, leaving the court to  . . . put flesh on its bones." *McPherson v. Kelsey*, 125 F.3d 989, 995-96 (6th Cir. 1997).

### 2.    Eighth Amendment

#### a.    Warden Burt

In Count I, plaintiff alleged that since June 4, 2015, he wrote kites to MCF Warden Burt about his poor medical care at MCF, but the Warden never spoke to him or intervened on his behalf.  While at MCF, plaintiff was under the medical care of the facility's medical staff.  Warden Burt is not one of the medical professionals responsible for plaintiff's medical care.  "Because § 1983 liability cannot be imposed under a theory of *respondeat superior*, proof of personal involvement is required for a supervisor to incur personal liability." *Grinter v. Knight*, 532 F.3d 567, 575 (6th Cir. 2008).

In addition, Warden Burt was not deliberately indifferent for allowing the prison's medical staff to do their job of treating prisoners, including plaintiff. As one court explained, a

prisoner cannot manufacture a federal constitutional claim against a warden based upon letters sent

to the warden expressing dissatisfaction with the medical treatment:

> [The defendant warden] certainly was not deliberately indifferent by allowing the [grievance] process to play out. He would be well within his role as head of prison to permit the established grievance process to go forward. Harmonious case law from around the country supports this result. *E.g., Conaway v. Godinez*, No. 15-3339, 2015 WL 9047569, at *4 (C.D. Ill. Dec. 16, 2015) ("Plaintiff cannot establish personal involvement and subject an official to liability under § 1983 based merely upon a letter writing campaign." (internal quotation marks and alteration removed)); *Cooke v. Morgan*, No. 11-073-LPS, 2011 WL 5523267, at *3 (D. Del. Nov. 14, 2011) ("Plaintiff cannot maintain a constitutional claim merely because Warden Morgan did not respond to his letter."); *Lampley v. Mitcheff*, No. 3:08-CV-282 PS, 2010 WL 2346329, at *6 (N.D. Ind. June 8, 2010) ("Therefore, simply receiving prisoner correspondence—a tort claim notice, for example—about a medical problem does not make a non-medical prison official liable for the failure to provide medical care under the Eighth Amendment. . . . The fact that Finnan and Brown, who have no medical expertise, did not directly intervene in Lampley's care and tell 'medical staff how to do its job' cannot be considered deliberate indifference.") (citing *Burks v. Raemisch*, 555 F.3d 592, 595 (7th Cir. 2009)); *Junne v. Atl. City Med. Ctr.*, No. 07-5262 (RMB), 2008 WL 1901111, at *15 (D.N.J. Apr. 25, 2008); *Sartain v. Scribner*, No. 1:04-cv-05621-LJO-SMS PC, 2008 WL 1773870, at *4 (E.D. Cal. Apr. 16, 2008) ("[P]laintiff's allegation that . . . Warden Scribner did not help when he wrote letters to [him] about his need for Methadone does not rise to the level of deliberate indifference to a serious medical need."); *Chase v. Ward*, No. CIV A 98-4100, 2000 WL 572711, at *2 n.5 (E.D. Pa. May 10, 2000) ("A warden who is not a medical professional is not deliberately indifferent merely for failing to respond directly to the medical complaints of an inmate who is being treated by professional staff on whose expertise the warden may rely.").

*Ramsey v. Haney*, No. 5:15-CV-117-DCR-REW, 2016 WL 8856665 at *6 (Feb. 5, 2016), R&R

adopted, 2016 WL 782394 (E.D. Ky. Feb. 29, 2016). *See Pounds v. Myers*, 76 Fed. Appx. 630,

632 (6th Cir. 2003) (a warden cannot be held liable on an Eight Amendment claim involving

inadequate medical care merely on the basis that he or she failed to remedy a grievance presented

by a prisoner).[10] For these reasons, Warden Burt should be granted summary judgment.

---

[10] Even though plaintiff cannot manufacture a deliberate indifference claim against the warden based on a letter writing campaign, the Court notes that Warden Burt responded to plaintiff's letters. *See* Memoranda (June 23, 2015; November 25, 2015; February 2, 2016; April 20, 2016; May 11, 2016; May 17, 20160 (ECF Nos. 140-7 through 140-12, PageID.2207-2224).

### b.    RN Hamilton

In Count III, plaintiff alleged that on June 10, 2015, defendant RN Hamilton was deliberately indifferent to his medical needs because she cancelled his accommodation order for a padded cane handle.  In her affidavit, RN Hamilton stated that on June 10, 2015, she evaluated plaintiff's need for can handle padding and determined that based on a physical assessment and review of the medical record, the cane handle padding was not medically indicated and the related special accommodation was discontinued pursuant to Operating Procedure (OP) 04.06.160 ("Medical Details and Special Accommodation Notices").  *See* Hamilton Aff. (ECF No. 140-3).[11] At that time, Hamilton noted that plaintiff was not using the cane correctly and had no need for the padded cane (which had been added by an RN in a previous accommodation).  *Id.*; MDOC Records (ECF No. 141, PageID.2226).  Hamilton did prescribe plaintiff a wooden cane without a padded handle.  MDOC Records at PageID.2227. Hamilton further stated that a medical provider evaluated plaintiff on October 29, 2015, and again determined that the cane handle padding was not medically indicated.  *See* Hamilton Aff. Plaintiff's disagreement with the removal of this medical accommodation does not establish the basis for a constitutional claim.  *See Woodberry*, 146 Fed. Appx. at 977; *Owens*, 79 Fed. Appx. at 161. Accordingly, defendant Hamilton should be granted summary judgment with respect to this claim.

### c.    HUM Wilkinson

In Count XII, plaintiff alleged that on January 26, 2016, HUM (and RN) Wilkinson was deliberately indifferent to his serious medical needs because Wilkinson took away his shower

---

[11] The Court notes that defendants' counsel e-filed a previously efiled copy of defendant Hamilton's affidavit.  As a result, the ECF and "PageID" numbers are unintelligible to the Court.  After defendants filed their brief, the Court adopted W.D. Mich. LCivR 5.7(d)(vii)(B), which provides that "Filers must <u>not</u> attach as an exhibit any pleading or other paper already on file with the court, but shall refer to that document by the ECF No. identified thereon, found in the document header displayed at the top of the electronically filed document."

chair.  In his affidavit, defendant Wilkinson referenced medical records which reflect that plaintiff had a shower chair in his possession; that the chair was removed from plaintiff's cell and made available for other prisoners; that personal shower chairs are not provided to prisoners for individual use; and that plaintiff could still use the shower chair. Wilkinson Aff. (ECF No. 140-5); MDOC Record (ECF No. 141, PageID.2254).  In this regard, plaintiff acknowledged that he had access to the shower chair in one of his letters sent to defendant Warden Burt.  *See* Letter (ECF No. 140-9, PageID.2213) ("They told me another inmate needed to use my shower chair [previously issued by the MDOC].  They took my shower chair, and now they keep it in the [unintelligible], and I have to get a custody officer to get it when I need to use it.").  Plaintiff had access to a shower chair.  He has not demonstrated that defendant Wilkinson was deliberately indifferent to a serious medical need.  Accordingly, Wilkinson should be granted summary judgment with respect to this claim.

### d.    Wilkinson and Hamilton

### i.    Count IV

In Count IV, plaintiff alleged that on June 24, 2015, defendants Wilkinson and Hamilton scheduled an appointment with Dr. Howard to discuss plaintiff's details and accommodations, which resulted in Dr. Howard taking away plaintiff's basin tub and Epsom salts. Plaintiff's claim does not allege that Wilkinson or Hamilton engaged in any wrongful conduct.  To the extent that plaintiff is complaining about losing his accommodation, the medical records reflect that the MP, Dr. Howard, removed the accommodation for a basin tub and Epsom salts on the new medical detail orders issued on June 24, 2015.  *See* MDOC Records (ECF No. 141, PageID.2228, 2232-2236, 2235).  Accordingly, defendants Wilkinson and Hamilton should be granted summary judgment on this claim.

26

### ii.    Count VI

Similarly, in Count VI, plaintiff alleged that on August 7, 2015, Wilkinson and Hamilton scheduled plaintiff to see Dr. Worel to discuss details and accommodations, which resulted in the doctor cancelling plaintiff's hot water bottle, ace wrap, and ice.  As in Count IV, it was the medical provider (Dr. Worel), not the MDOC employees (Wilkinson and Hamilton), who made the decision to cancel plaintiff's accommodations. In this regard, the record reflects that on August 7, 2015, Dr. Worel advised plaintiff that "ace [bandage] and Ice dfor [sic] acute problems only" and that "Hot water bottle is not indicated".  MDOC Records at PageID.2242; 2252 (clinical progress note from August 7, 2015, stating that "6" ace wrap with two metal clips and one hot water bottle were turned in to HS today as Dr. Worel determined they were not medically necessary and SAN/detail was not renewed.").  Accordingly, defendants Wilkinson and Hamilton should be granted summary judgment on this claim.

### 3.    First Amendment retaliation (Counts XIII and XVI)

Finally, plaintiff has alleged that on February 18, 2016 (Count XIII) and April 20, 2016 (Count XVI), defendants Wilkinson and Hamilton retaliated and harassed plaintiff by having officers shake down his cell.  To prove a First Amendment retaliation claim, plaintiff must establish three elements:  "(1) the plaintiff engaged in protected conduct;  (2) an adverse action was taken against the plaintiff that would deter a person of ordinary firmness from continuing to engage in that conduct; and (3) there is a causal connection between elements one and two -- that is, the adverse action was motivated at least in part by the plaintiff's protected conduct." *Thaddeus-X v. Blatter*, 175 F.3d 378, 394 (6th Cir. 1999).

Defendants summarized the alleged events of retaliation as follows:

On February 18, 2016, and April 20, 2016, Defendants Hamilton and Wilkinson in accordance with their duties went to Plaintiff's cell to evaluate cell

conditions and check for the appropriate use of issued special accommodations. (Ex. 2 ¶6 [Hamilton Aff.] and Ex. 4 ¶6 [Wilkinson Aff.]). Both Defendants determined that the special medical accommodations that Plaintiff was receiving were not being used for their intended purpose. Defendants left Plaintiff's cell in the condition it was found and did not harm his property. *Id.* No items were removed during either visit and no items were torn. Defendants, as MDOC employees, can search prisoner's cells. (Ex. 5) [MDOC Policy Directive 04.04.110 "Search and Arrest in Correctional Facilities"].

Additionally, Defendants' April 20, 2016, search of Plaintiff's cell revealed valid suspicions that Plaintiff was not using his accommodations properly. A cotton blanket that he was provided by healthcare was found under his mattress contrary to issued instructions, and a toilet seat riser was found sitting on top of his locker with several items inside of it. (Ex. 2 ¶10 and Ex. 4 ¶10). These inconsistencies were reported to the medical provider and these accommodations were taken away from Plaintiff. (Ex. 1 Page 30-31) [MDOC Records at PageID.2254-2255]. Not only did Plaintiff fail to establish what protected conduct he was engaged in, but he also failed to show that any adverse action was taken against him because of that action.

*Id.* at PageID.2172-2173.[12]

Defendants point out that "[p]laintiff does not claim what protected conduct he was engaged in nor has he made any causal connection between the search of his cell and any protected conduct." MDOC Defendants' Brief (ECF No. 140, PageID.2172).  A plaintiff must present more than conclusory allegations of retaliation.  *See Harbin-Bey v. Rutter*, 420 F.3d 571, 580 (6th Cir. 2005).[13]  Accordingly, defendants Wilkinson and Hamilton should be granted summary judgment on these two retaliation claims.

---

[12] In his response, plaintiff points out that the version of PD 04.04.110 attached by the MDOC defendants was revised on 08/14/2017, and was not in effect when the alleged incidents occurred in 2016.  The Court has not considered this policy directive in addressing plaintiff's claim.

[13] The Court notes that plaintiff's response includes his own "2-part Analysis" of his retaliation claims.  Plaintiff's Response (ECF No. 144, 2274).

## V.    Recommendation

For the reasons set forth above, I respectfully recommend that defendants' motions for summary judgment (ECF Nos. 125 and 139) be **GRANTED** as to all remaining claims and that this action be **TERMINATED.**


Dated:  September 12, 2019                          /s/ Ray Kent
                                                    United States Magistrate Judge


ANY OBJECTIONS to this Report and Recommendation must be served and filed with the Clerk of the Court within fourteen (14) days after service of the report.  All objections and responses to objections are governed by W.D. Mich. LCivR 72.3(b).  Failure to serve and file written objections within the specified time waives the right to appeal the District Court's order.  *Thomas v. Arn,* 474 U.S. 140 (1985); *United States v. Walters,* 638 F.2d 947 (6th Cir. 1981).